case number 20-5161 phoenix herpetological society inc appellants versus united states fish and wildlife service et al mr coles for the appellant mr richmond for the appellates morning counsel morning your honor frederick coles the third if it may please the court i represent the appellate in this manner uh phoenix herpetological society inc and we are here to set aside and vacate the um granting of two of a joint motion basically by the agency to deny my client a renewal to its captive bred wildlife registration and to deny a second or companion application to export um grand cayman blue iguana to the albert zoo in albert denmark we look at this application and take the position that the agency's decision making process denying the two applications was arbitrary capricious and reasonable secondly we think that the district's court the district court upholding of those decisions is factually and fatally wrong in that there is a lack of transparency as it relates to the process that the agency utilized and invoked in order to deny the applications and i think there's one central issue that is related directly to both of the applications both the denial of the renewal of the cbw and the denial of the export and it has to do with the agency's position that the zoo meaning phs did not meet its burden as to establishing that the founder stock of cayman um iguanas were legally brought into the united states it takes the on the export question um why isn't the agency's department's decision that uh sending two blue iguanas iguanas to denmark doesn't satisfy the criteria of the statute because of the your export request we don't believe that it is your honor based upon the fact that the agency's decision in that regard was not based upon the best scientific information or data it is true that the albert zoo does not have any blue iguana in its possession but the purpose of both the agency and the exporting regulations is to help to propagate the conservation protection and promulgation of the species and conservation of the species the alberg zoo just like my client is a well-established zoo it's capable of raising and breeding the subject iguanas the agency takes the position that because the two animals that are subject to export come from the same clutch what the what the agency is doing it's comparing the breeding of reptiles to that of mammals and or birds when the breeding of reptiles is it's a different category the information that was provided to the agency it cherry-picked information to overlook from the authority that it relied upon that being fred burton that inbreeding did in fact occur not only on the island itself in the wild but also while they had certain iguanas and their protective captive possession that inbreeding did in fact take place that's recognized in a couple of emails that are part of the administrative record coming from fred burton that were available to the agency to review the agency chose to the lack of genetic diversity without any support for such was the basis for denying in my our opinion is the basis upon which they're denying the application and as much as it's not supported by the facts of the record and it's not supported by any literature of any type of of scientific treaty we take the position that that decision is in fact unreasonable capricious and just flat wrong now i'm going to the registration question uh after you have submitted various explanations uh with respect to the export why wasn't the agency uh legitimate including we just don't trust you anymore you should you gave three different wildly different explanations with respect to the ancestry of these uh animals if i may your honor this was an issue that i wasn't that my briefing when i say my briefing because i substituted in as your as your honors are aware did not particularly address the reason why i didn't address this because there was an ongoing fight from my review of the record between the agency between another individual named i believe it's mr schumacher who my client had originally engaged um certainly a while prior to this particular application then there was a brouhaha as to mr schumacher's involvement ultimately my client terminated mr schumacher with regards to the application process there's also information that that mr schumacher gave incorrect information to the agency while my client was in fact hospitalized in icu as a result of being bitten by a poisonous snake when he comes out of the hospital he owns up to the mistake that was made by mr schumacher and bears himself and that's how we get to the various explanations that your um honor asked me about but from our position we are consistent in what it is that we're asking for and we don't believe that those missteps are such that the agency's denial as to mr blair's affidavit should be taken into the in the same vein so let me just follow up a little bit on the first point that you were discussing with judge silverman about the genetic problem yes uh you certainly are correct that mr burton talks about inbreeding happens but the question that the agency had was not does it happen as it were but is this something that's desirable in both the propagation of the species and not harming it in other words a different question things happen but that doesn't necessarily mean that's what you want to see happen when it's on your watch i think the best way that i can answer your honor's question is this the agency certainly has not pointed to any information any scientific data any type of reliable scientific information to say that such inbreeding does not occur in iguanas in their natural habitat even though these animals are in fact in a conservation program within a protected environment if it's happening in the wild the fact that it happens in the wild and even mr burton acknowledged that it did in fact happen while the same wild animals of the same species were in captivity the agency's position here is not supported by any scientific information to show that there be a detriment to any animals that were in fact engaged in any form of inbreed so um the court defers to the scientific and expert judgments so i'm just trying to understand is your position not that the agency was required to acknowledge that there's nothing wrong with application it had to point to scientific evidence that breeding inbreeding is harmful to the species i think not i think but the my my position is slightly different than that and i'm not trying to sort of put it in the realm of engaging in semantics but basically our position is there is no scientific and information that shows that inbreeding among reptiles and specifically among blue caiman iguana is detrimental to the perpetuation conservation and preservation of the species in an instance where those same animals are in fact listed as and the statute requires the agency to find that this is going to enhance propagation of the species um can the court say it was wrong to conclude that that would not be consistent with the statutory standard i think the court has the authority to conclude that that is wrong if that position by the agency is not supported by scientific information well as you understand go ahead who's trying to talk here excuse me not only is this a scientific question it's a predictive judgment on the part of the agency to which we typically defer as well um in other words if you don't know one way or another uh just the risk as judge rogers is suggesting is a legitimate basis upon which the agency would deny the export license i am out of time if your honor i would like to respond yeah yes our position and the record supports it i think it's even acknowledged in um the agency's brief that my client started with initially four um grand caiman blue iguana and he has grown the population through its conservation efforts to a total of 22 iguana there's been no incidence of any type of deformities that have noted there have been no um incidents of any type of uh bad behavior problems um deficiencies or anything with respect to my client's care conservation and preservation of these animals he is now based upon moving forward with promulgating the species to assist the albert zoo and basically engaging in the same course of conduct that it did which in fact has been successful and is in fact contributing to the promulgation of the species by having increased the number from at least four up to 22 and possibly more as we're here today so i guess my my last question here is your client clearly had the burden and you don't deny that so that uh while i agree i don't read any criticism as you're suggesting of what your client has done here the agency was looking at an export to a zoo that has no iguanas and this inbreeding concern and given what the statute is talking about in terms of enhancing propagation of the species why not for sort of expertise and as judge silverman points out predictive reasons um the agency could reasonably deny the permit i your honor is correct that we do have the burden i think we certainly by review of the record i think that we have in fact satisfied our burden i think there's an ample amount of and um i believe it's a silverstein forensic report which when you look at the agency's denials there's no reference to that there's no taking into consideration any of that there's no refutation of anything that was put forth in that report that addresses the very questions that your is creating an unreasonable and an impossible hurdle as it relates to the export of these animals the agency relies upon the position while the outboard zoo has no blue caiman iguanas in its possession there was a point in time when my client had no blue caiman iguanas in its possession and yet it has sufficiently added to the number of such animals in existence similarly every facility that's going to engage into a conservation program has to start at step one step one is in fact the first set of animals that are capable of breeding and assisting in establishing where there's information in the record that certainly shows the criteria and the qualifications of the people who operate the zoo there's certainly nothing deficient as it relates to their qualifications and secondly what the agency is doing without supporting it but it's sort of implicit in their denials and in their rationale is they're trying to make and assert and inject into this equation the position that the raising of grand caiman blue iguana is somewhat unique and distinct from the breeding of any other type of lizard or other iguana and the record in the scientific record is not does not support that position can i ask on the lawful acquisition point your brief as i understand it you assume on the law that it's your burden to show that the parent stock was lawfully acquired and you argue on the facts that you discharged that burden is that a characterization your position just so that we're clear and that i didn't misunderstand your question our position is that the founder stock came into the country prior to the enactment of either the laws and the grand caiman here and situs you haven't made the broader argument that that question is irrelevant is legally irrelevant i didn't look at it as a question of being legally irrelevant i looked at it as a question that was being raised with no basis by the agency because you think you you think you prove lawful import of the parent stock that it that they came in before the listing yes i believe that my client has sufficiently met its burden in that regard and i don't think there's anything in the record that contradicts that in any way okay thank you all right we'll give you some time on rebuttal let's hear from counsel for appellees good morning your honors and may it please the court my name is ben richmond and i represent federal appellees your daughter with this case concerns uh is the denial of two different permit applications a captive bred wildlife registration and an export permit both of which pertain to plaintiff's population of grand cayman blue iguanas a species which has been listed under the endangered species act since 1983 and protected under the convention since 1977 what is really here at the heart of the case is plaintiff's applications for these two separate permits and whether the information submitted by plaintiff meet all of the standards required for the service to grant those permits so what i'd like to do your honors is briefly frame up for our benefit the different requirements for each of these group each of these different permits i'll start with the export permit the export permit was plaintiff's application to export four of its grand cayman blue iguanas to the albergue zoo in albergue denmark for these expert export permits there are two groups of findings which need to be made first a finding under the endangered species act that the export would enhance the propagation or survival of the species then and the other group of findings for the export permit are two findings under the convention that is a legal acquisition finding that the the species to be exported and its parental stock have been legally acquired and a non-detriment finding that the animals to be exported would not be detrimental to the species as a whole and in particular the species in the wild the other permit at issue here is the captive wildlife registration and what a captive wildlife registration is is it allows otherwise prohibited activities under the endangered species act for the purpose of some sort of beneficial breeding program a captive breeding program designed to promote the endangered species in question so here there are various findings that need to be made for that captive bred wildlife permit and those findings cannot be made unless the parental stock of the animals covered by the permit have been legally acquired so those are all the various requirements there are three that are relevant here for the export permit and there's one really that's relevant here the captive bred wildlife registration now the burden was on plaintiff as as your honors discussed previously burden was firmly on plaintiff to provide enough information to allow the service to make these various findings and grant both of the applications but after three rounds of administrative review that just wasn't possible here and the service was not able to make these findings that would allow it to grant these permits i'll briefly talk about the findings that were made on each of these permits here so beginning with the export permit i discussed there were three findings which were crucial the service could not make two of those findings it was not able to make an enhancement finding because it determined that plaintiff's final representation that it sought to export four iguanas born from the same clutch to alberg denmark where it would have no other iguanas for those that want us to breed with would not be consistent with genetic diversity it also made a finding on legal acquisition as your honors discussed previously there were three shifting explanations of the blue iguanas that plaintiff sought to export first it sought to export iguanas from the life fellowship in the san diego zoo after that application was denied plaintiff said it wanted to export two pairs of iguanas one originating from ty park in florida the other two originating with ramon noagle then after that application was denied there was yet another representation that plaintiff sought to export four iguanas all from ramon noagle those shifting explanations here were not credible and cannot be corroborated by a hearsay affidavit which again the service was not able to credit because there were serious issues with the credibility of that information well let me ask you that yes judge silverman thank you on the blair affidavit part of it was not hearsay wasn't it what blair himself uh observed or did yes your honor all blair attested to as the affian was that ramon noagle had told him that ramon noagle had acquired these iguanas in 1971 that's not all that's not all blair did though he tested he his affidavit also describes what he did and that's not hearsay correct your honor what blair did himself was not hearsay but the information about legal acquisition which is the relevant part of the affidavit that that would have been relevant to that legal acquisition requirement uh was a hearsay statement what about what about your own investigation which indicated possibly that uh that blair was correct um so your honor i just want to clarify that the the investigation of the service stated went above and beyond um its requirement to review evidence here it could have just stayed right but it didn't so yes your honor judge silverman is saying it had that information before it yes your honor so what the service did in its which has reflected its various emails is it tried to determine whether the blair affidavit uh did have any credibility and that account had any credibility and to do so it reviewed ramon noagle's published iguana research published in 1980s to try to verify if these iguanas which had supposedly been imported into the united states in the early 1970s had been present in the united states before the iguanas were protected under law excuse me your investigator determined possibly blair was right your honor what the service determined was that um there was not enough evidence in that research to show that the iguanas had been in the united states before protection under the convention in 1977 the the service and they not only reviewed the iguana research published by ramon noagle they also talked to fred burton uh and asked fred burton to see who's an iguana researcher with the grand cayman islands government whether he could corroborate an import of iguanas and again there wasn't credible information uh from mr burton who was the one who was the one you of your investigators that said it was possible that blair was right your honor i believe that was fred burton's recollection in his email he he begins his email by saying i understand that this may have happened and it is possibly legal um but there were there were serious issues with his account so for example he uh he he that an individual named roger fair had uh orchestrated the export um in in what he had heard about this export and the issue was that the service had information before it that roger fair had not arrived on grand cayman until the 1980s and in addition that account uh attributing the export to roger fair uh conflicted with ramon noagle's recollection which was that ramon noagle had captured these iguanas in the wild and shipped them back to the united states in his check baggage um so these many and different varying accounts were just not enough to show a legal acquisition finding here so basically the agency wants a bill of sale that's been notarized no your honor uh you know any any clear information that the iguanas had existed it is that the the man who blair referred to is dead yes your honor all right so i understand a direct statement from him so that's why the agency is saying uh in those circumstances we're not going to conclude anything less than a bill of sale is there there's no uh there's no announcement that a bill of sales required your honor this is why the research about the reality of what happened here yes your honor you made your own investigation you had some indication that this probably happened the way people were saying there were no eyewitnesses there was no written bill of sale and you're just not where somebody's on the appendix one not somebody but some species is on appendix one there's a very high burden says the agency even though the requesting party here has an admirable record and the zoo in denmark has an admirable record but it just doesn't have any blue iguanas your honor a bill of sale wasn't required the the service looked at the research published by ramon newagle in part to try to corroborate that some of these iguanas had just been present in the united states in the early 1970s any record from a zoo or research institution that these iguanas were present in the united states would have sufficed you know zoos research institutions they keep track of the animals in their collection but counsel what appears to have happened here is some of these exotic species were being brought in surreptitiously yes your honor you don't have a you don't have a legal trail yes your honor appears that that may have been an issue he decided it was going to issue this rule establishing this program so what would otherwise be legal activity could be legal provided all these criteria were met and if weren't met in the agency's view you wouldn't get your permit correct if if a uh if an export here is is to be done then that export has to have animals that have been legally acquired or their parental stock and their parental stock have been legally acquired that is consistent with the conservation mandates of the service you know what occurs to me counsel as time goes on the getting evidence of legal acquisition prior to the effective date of the statute when the regulation you necessarily are going to rely on hearsay because people are going to be dead again it's it's discriminating against old people no your honor certainly not um so i i just want to clarify you know the burden here is on plaintiff to present sufficient evidence and perhaps in some cases hearsay could suffice uh but here there's just no indicia of reliability to corroborate the hearsay statement um that's the problem is a fellow who made the comment noble is it uh he's no i'm sorry i'm mispronouncing he's dead isn't that correct yes your honor yes and and the service you know exceeded its burden here to review evidence related to acquisition and and tried to find additional uh corroboration of that hearsay statement understanding that that could possibly be the best evidence before them um but you know when it went looking for that information ramon de weggles published iguana research with its correspondence with fred burton it could not corroborate the hearsay there was no indicia of reliability which would allow the service to accept that hearsay for the legal acquisition finding why does legal acquisition of the parent stock even matter the treaty requires that the specimen be lawfully acquired and specimen is a defined term that means the animal itself not the animal and go 10 generations back to the beginning of time four decades ago yes your honor so uh legal acquisition is part of uh one of the findings under the convention and in order to i don't have the specific rule here um but those rules your regulation under the treaty says specimen or parental stock the treaty just says specimen yes your honor i mean it may be the short answer is this wasn't um this wasn't challenged but you you may be asking us to exist depending on whether the regulation is a proper interpretation of the statute yes your honor and so because these issues weren't raised below uh the service didn't have an opportunity to brief the specific rules promulgated here to carry out the convention um but if your honors would potentially like additional information or briefing on that matter on that issue is is raised and somehow even though it wasn't raised below we'd be happy to do that okay i'm certainly not requesting uh additional briefing thank you your honor talk a little bit if you will about the um denial of the re-registration request yes your honor uh thank you for asking that so the captive bred wildlife registration um the issue there was again the legal acquisition of parental stock and um that registration you know it was because essentially what was being considered in the captive bred wildlife registration was the entire population of 22 blue iguanas that plaintiff had in its possession and the service um prompted plaintiff to submit that information on the legal acquisition of its parental stock and through three rounds of administrative review um there was no information submitted about the entire so let me just be clear um this organization so far as a record indicates has a good record it's not as though it's been cited by the agency over time for violating regulations or anything not to my knowledge your honor well not in the record before us not not not in the record and i don't think we want to apply that there may be something out there because the agency hasn't presented that no point in sparing somebody's reputation okay so they've been receiving these registrations for years and have done a good job with this particular species growing it but following up on judge silverman's point time passes people die they can't get the original owner so they come up with the best information they have and it's true the agency says well we can't definitively determine legal acquisition of the parental stock is there any different standard for export versus registration your honor the regulatory scheme for exports um versus captive bred wildlife programs are different and and i tried to describe that a little bit earlier uh you know the the finding that's key under the captive bred wildlife registration is um it's provided under 1721g which is a rule there are a variety of different findings and factors which the service would ordinarily have to make to grant that captive bred wildlife registration um but those findings can't be made unless the parental stock of the species covered by the captive bred wildlife permit have been legally acquired so the question is what is the burden for re-registration what i'm talking about is yes somebody's been operating under your registrations for years yes and there's no evidence that they have ever come into a review or investigation by the agency now they want to export some iguanas and they've got a problem all right genetics apparently as council tells us um there was some fight going on and some misrepresentations were made but um petitioner owned up to them and hoped to go forward so i'm just a little concerned that under those circumstances i mean what is the status now is everything they're doing illegal can they be fined can they be shut down your honor uh the only real result of the permit be revoked is is not having that captive bred wildlife registration for their iguanas this is not an enforcement action i understand that you haven't brought that yet what i'm getting at is they're trying to run a lawful operation yes your honor they've had the blessing of the agency for years and sure they don't have bills sales apparently for every animal in their custody now these 24 blue iguanas yes your honor so so issues arose about the parental stock of the iguanas in question here and they arose because of the export application and now um well excuse me excuse me council to make it clear with respect to judge rogers question your actions so far implicates only the blue iguanas in the stock of the company or the zoo is that correct yes your honor these these actions are issued here only as to phoenix herpetological society's limited to the blue iguanas i misunderstood i thought the registration affected only the blue iguanas not the other animals is that right correct your honor there were a whole host of different animals listed on the captive 24 iguanas they have no authority to maintain them correct your honor they're they're not uh i want to be careful about how i answer this question because there are different regulatory schemes at issue here but essentially the plaintiff um is not licensed to cap uh excuse me conduct a captive bred wildlife program as with respect to these grand cayman blue what happens to these blue iguanas i know what happens to uh the phoenix group so um your honor the the final administrative denial here that was issued by the service prompted um plaintiff to work with the service and potentially you know submit additional information that could corroborate legal acquisition but even after that final administrative denial that said j 615 council would just we're curious what happens to the to do what potentially enforcement action could be brought i don't want to speculate as to what the service would do um or the service could try to continue to work with plaintiff to try to get this captive bred wildlife registration um renewed as it prompted plaintiff to do at j 615 but also if you still deny the registration what happens to the blue iguanas the blue iguanas are still there they're no longer uh there's no longer an exemption under section 9 of the endangered species act that would allow plaintiff to collect capture you know you're not you're not answering the question why can't we be worried about the blue iguanas i i'm not i'm sorry i'm not sure i understand your honor we want to know what happens to the blue iguanas if the registration to hold the blue iguanas is denied yes your honor as far as i understand now nothing um currently will happen plaintiff will still have the blue iguanas they won't be covered by this permit well let's let's try it this way yes assuming the cbw registration is not reinstated is it presently lawful for them to possess iguanas no your honor wow oh therefore what happens to the blue iguanas you don't know uh i i don't know it's again it's at the discretion of the agency uh how it would and why why is that is that because is that because you understand the verb take to include possession your honor section 9 also prohibits collect without clearly without the permit they can't they can't export they can't sell i get that they cannot collect either that's that's well collect can mean collect can mean acquire you think it you think it means possess perhaps your honor and and again we didn't have the opportunity to brief this below um i guess there is a question as you're raising about whether most nuclear of all remedies they they they just shut down they can't breed they can't possess what they're they're out of business well they're not out of business because you're i gather they do they collect or have uh a lot of a lot of different animals as to but as the blue iguanas they're out of business and that no mystifies to me as to what happens to the blue iguanas you're not going to go out there and kill them no your honor and again in terms of you know a remedy or a way a path forward here the the most beneficial thing to to happen would be for plaintiff to continue to work with the service and attempt to try to corroborate uh legal acquisition and obtain that captive bred wildlife permit and i understand that's that's the problem though the agency is saying i want a bill of sale they've and i know you say here say if it's corroborated but they tried to cooperate it in several ways and that was not satisfactory to the agency and that's why i raised the question whether or not the standard under the export permit is different than the standard under the possession in the circumstances where over the years the agency has issued these registrations and this particular organization has been very successful in propagating these blue iguanas and there's no evidence of any concern by the agency until now and yet the agency says well we're probably wrong and issuing all these previous yes your honor the agency conceded that at j373 that it might have to re-evaluate prior approvals that it might have to that it may have to re-evaluate prior approvals in light of this legal acquisition anything they just put him put who is it it's the phoenix herpetological society in a precarious position that's all i'm getting at yes your honor the burden here was was on evidence you know after three rounds of administrative review and working with the agency plaintiff wasn't able to provide that information when was the first registration issued back in the early 80s no your honor uh i i actually don't have in the record the um approximately registration beyond the one that was set to expire in 2017 so i'm not exactly sure at this time how many previous well it happened for dozens of years is what i'm getting at now the agency comes along with a new concern okay um presumably they blew iguanas could go to another zoo that has a registration but i don't understand how the other zoo can accept them except there's no proof of lawful entry of the parent stock and under your interpretation the agency's interpretation that's what judge silverman is focusing on do you have to kill these iguanas nobody has authority to maintain them because you can't come up with this bill of sale or this passport okay well i'll be interested to hear uh council for petitioner's response to our concern about the blue iguanas all right why don't we turn to council for petitioner we'll give you another couple of minutes thank you your honor um your honor had asked whether or not there was a difference as to the legal acquisition as it related to the cbw registration and as it related to the export my understanding from a review of the decisions that were rendered by the agency was that was the lynch pen upon which really both of these applications were denied council council would you help us we're all puzzled at what the significance of the denial of registration we understand the denial of export but what is the significance of the denial of registration in real terms what happens i think your honors were hinting around it um well i don't think we're hinting no no we're absolutely puzzled we don't know i'm being i was being somewhat polite to the extent that i believe based upon what my colleague said the animals they're not legally acquired so if if they're not legal legally acquired by the agency's determination and that lack of legal acquisition prevents my client from exporting them with the in the same vein and along the exact same parallel track they cannot be transferred to another zoo as that as was suggested because that transfer would basically negate the reason for denying the export reason based upon legal acquisition that's what that's what judge rogers pointed out and i want to know what happens what happens to the blue iguana do they do they still say at your stay at your client's location even without registration based upon what my colleague said i believe the inevitable answer is which he refused to provide because they get destroyed that can't be true well he didn't if i can't he said i'm not legally allowed to withhold i mean this is what's well yeah i thought he was saying excuse me judge katz's he was saying well the agency has discretion as to whether it brings an enforcement action but you know yes judge chances i mean i if they get destroyed then that's harm which is a separate yes a violation if they don't if they don't get destroyed that's continued possession which the government thinks counts as collection um which is a violation so what do you do your honor i look at this and i say here's an agency and this is what the whole basis of our position is it's arbitrary it's capricious and it's absolutely unreasonable for many of the reasons that are the concerns of all three of your honors yes but you're not answering the nobody's answering the question what happens to the blue iguanas i know he answered it i believe they get destroyed is that that can't be correct i don't know because that's certainly can i go back to council for the government are you saying it's likely they'll be destroyed i'm asking council for the government no no your honor can you assure us they won't be destroyed i i think it would be highly unlikely that they would be destroyed it'd be hard for me to believe that unfortunately what i'm what i'm struggling with here your honor is um we don't know what the agency will do in its discretion here uh that's my point that's the only answer exactly exactly the society has hanging sort of a sort of damocles over its head so one day the agency shows up on its doorstep with an enforcement action um so maybe a modification to the regulations is required i'm sorry may i speak council and sorry may i speak your honor um uh perhaps i i just wanted to emphasize you know there are three rounds of administrative review here um and and the try to collect the information available to meet these requirements perhaps the regulations um you know perhaps the regulation could be challenged in the future perhaps uh some of these issues of the regulations might be taken up but that just wasn't briefed here below or or challenged below does the service have some mechanism and this kind of problem must come up which is you find um you find people who are unlawfully possessing endangered species is there some mechanism by which the service if it chose could come in and take possession and care for the animals or or you know send them to denmark or whatever so your honor i'm sorry but i i wasn't able to familiarize myself with the specific enforcement provisions that the service would have available to it or any event are you taking are you saying that the denial of the registration itself has no uh enforcement aspect at all the denial of the registration has no meaning again um i'm sorry your honor but i i don't have that information available to me right now um if if the court again wanted supplemental briefing on this um the government would be happy to submit it i guess the question is clearly before us is a challenge that uh the denial of the registration renewal was arbitrary and capricious um and that's why i raised the question as to whether the agency views these requirements differently for export and registration and i thought that might be hinted at in your brief because you repeatedly criticized um petitioners for responding to the agency's request with one submission as opposed to responding separately as to the export separately as to the registration but i gather that is not your position and so the question is was it arbitrary and capricious for the agency to reach the conclusion it did here when so far as we're being told today it is possible that absent a registration the society has no authority to continue to maintain these iguanas that are on appendix one and it has no way to prove um what the agency is requiring and so the agency is essentially what do we say cutting off its own i'll get the analogy wrong but the point is it's supposed to be preserving and promoting and protecting and that's not the result here because if you have wild species for which the current lawful or previously lawful possessor cannot show a bill of sale then despite the preservation and enhancement desires the species has to be destroyed you're all right i just want to clarify a few points there um so in terms of this action being consistent with the policy of endangered species act you know that the service has certain conservation mandates um and part of that is making sure that there's a well administrated well uh administered captive bred wildlife program where uh individuals and research institutions aren't breeding um potentially iguanas with parental stock that have been legally required what kind of prospect the result of your argument is they have to be destroyed um because nobody has authority to have them because nobody can no no your honor that's not the position of the service that's not not the position investigated and it couldn't find anything to uh satisfy it that these iguanas were brought in lawfully the the position of the service is only that a captive bred wildlife registration can't be issued because plaintiff failed to meet the criteria outlined under the permit and also what is the conclusion and that's what judge silverman has been zeroing in on what's the implication of the denial of registration that has to be before us i think uh the presiding judge should ask the government to come in not necessarily with a new brief but just a statement as to what the significance of denial of registration is perhaps in 10 days what what happens as a result of that could we do that could we ask council to at least provide us with a statement as to what the legal implications of denial of registration are um judge katz's with me yeah all right um so we would like a filing by appellees stating what is the effect of the denial of registration yes your honor and specifically what happens to the 24 blue iguanas that the society currently possesses and has possessed for decades under registrations issued by the agency um and what do we want to say a maximum of five pages today is the 12th uh submitted to the court within a week that's fine is that possible be the 19th yes your honor absolutely the only reason i hesitate judge silverman is i don't know what the implication of that is for uh the petitioners and maybe we'll we'll see perhaps they should have uh the same five days to uh to give their responder to give their understanding of what the denial of registration means so simultaneous filings yes i think so otherwise it would drag it on too long no okay so you're suggesting five days it's giving them a week well whatever you say council for appellants um i believe um that i mean look i i i will defer to the court as to the time frame that the court wants to enforce all right but you would have no problem submitting a statement say today is the 12th by next friday a week from friday yeah that's sort of a week so that'll be fine all right and no more than five pages that would be fine as well may i make one additional comment that was raised very early in the argument as part of my rebuttal if i may yes i think judge silverman pointed out that the blair affidavit contained certain information that was in fact not hearsay and upon rereading some of my own writings i may not have written it as clearly as i probably should have and i noticed that when i was preparing for argument yesterday and was going through some of the materials that were in fact part of the record so specifically looking at ja 000175 which is in fact was the march 2nd 2006 affidavit from david blair to helen wilson the part that i that i believe the judge was referring to is where mr blair says i obtained in 1971 from roman najel in florida that is not hearsay that is coming from the individual and the maker of the statement himself it's not being used for certainly any controversial counsel we already recognize that yeah anything for me sir bird all right so then by march 19th council will submit a statement on the effect of denial of the registration um to the society and regarding the brawler's listed in appendix one currently in its possession thank you thank you thank you and we will await your filings thank you council thank you
judges: Rogers, Katsas, Silberman